## JOHN CHESS *against* FINLY CHESS, WILLIAM CHESS, WESLY CHESS, ANDREW CHESS, NELLY CHESS and MARY CHESS.

Declarations of a grantor made subsequently to the execution of a deed, can not be given in evidence to invalidate that deed.

But when the question to be determined by the jury, is whether the grantor was sane or insane, at and about the time the deed was executed, it is competent to give in evidence his declarations made soon after the execution of the deed, for the purpose of proving imbecility of mind.

A man's *neighbourhood* is co-extensive with his intercourse among his fellow citizens.   One witness, therefore, testified that he knew the general character of another witness, whose character was in issue, but he did not know his character in his *immediate* neighbourhood.   It is competent to ask the witness whether he would believe him on his oath.

A deed procured by actual fraud, is void, and cannot be confirmed by subsequent acts or declarations of the grantor.

A delivery is essential to the proper and legal execution of a deed, and that delivery may be to the party, to one authorized by the party to receive it, or to a stranger for the use of the party; but the placing a deed on record by the grantor, is not an absolute delivery, but only evidence of it, of which the jury may judge.

The court sustained the challenge of a juror, on the ground that he was subpœnaed as a witness to impeach the credit of another important witness, who was to give evidence in the cause in which he was called as a juror: which was held to be no error.

THIS was an action of ejectment brought to recover a tract of land in Allegheny county, and was tried at a circuit court held for that county by justice ROGERS.

Both plaintiff and defendants were children of *William Chess,* deceased, and both claimed the land under their father; the plaintiff, by a deed dated the 14th February, 1823, and the defendants as heirs at law.

It was contended by the defendants, that the deed to the plaintiff, from *William Chess,* his father, was void, in consequence of the mental incapacity of the grantor to make a deed on the 14th February, 1823, and that it was obtained by fraud. It was answered by the plaintiff that the grantor was of sound mind when he made the deed, that it was not obtained by fraud, and that subsequently to its date, it was confirmed by acts of the grantor.

*William Keir* was called as a juror, and objected to by the defendants, on the ground that he was a witness in the cause, subpœnaed by the plaintiff, to give evidence on his behalf; and who had given evidence on a former trial as to a material matter. The court sustained the objection; and the juror when sworn as a witness, testified to the character of *John Ross,* another witness, whose veracity was impeached.   During the progress of the cause, the defendants offered to give in evidence the declarations of *William Chess,* respecting the deed of the 14th February, 1823, to his son

(John Chess *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess, Nelly Chess and Mary Chess.)

the plaintiff, made after its execution, which were objected to by the plaintiff, but admitted by the court.

The following is the substance of the evidence given on this subject:

*William Kerns.*—In the spring of 1823, a short time before his death, old *William Chess* came to my house; he sat down and looked as active as I ever saw him before. We walked out together, and he asked me if I heard what his son John had done to him; I told him no: he then told me, that he had got a fall from his horse, and John was taking him to town to the doctors, and took him to sign a deed: he said that owing to the fall from his beast, he was not in his right mind when he signed the deed. He also stated, that John was to give him some property in town in exchange, but had not done so. He said that if John would not give him up the deed, he would compel him to do it. By giving the deed to John he wronged the rest of his family.—I have known *William Chess* long and intimately, and had never considered him of unsound mind.

*John Ross.*—In April or May, after my return from over the mountains, old *William Chess* called on me, and told me he had come to see the lease I had written. I got it and read it for him. I then asked him the reason he brought his family into so many difficulties, stating that on the 13th February he had given a lease for three years to his boys, and next day had given a deed for part of the same property to another son, who had brought suit to dispossess those he had leased to. The old man said he had been deceived by John. He requested a copy of the lease to shew to John, and said that then John would give up the deed. On the 7th May he called on me, and told me that John would not give up the deed; and requested me to go with him to John, and get him to do so.

The plaintiff then called a great number of witnesses, who testified that the general character of *John Ross* in his own neighbourhood, for truth, was bad.

The defendants then called witnesses in support of the character of *John Ross;* who testified, in substance, that they did not know his character in his own neighbourhood; that they lived two, three, and four miles from him, and had little intercourse there with the neighbours of *Ross;* that they had heard his character spoken of where they lived and elsewhere, and that some spoke well, and some ill of him.

The witnesses were then asked by the defendant's counsel whether they would believe him on his oath, from what they knew of his general character.

This question was objected to by the plaintiff's counsel, but the court permitted it to be put, and the witnesses answered, "as far as I know him, I would believe him."

(John Chess *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess, Nelly Chess and Mary Chess.)

Other witnesses testified " that they had known *Ross* a number of years—lived within three or four miles of him; that they did not know his character for truth in his own neighbourhood; that they had never heard it spoken of, one way or the other." To whom the court permitted the same question to be put and answered, upon objection being made by the plaintiff.

Other points arose, which will sufficiently appear in the reasons assigned for a new trial, and the opinion of the court.

A verdict was rendered for the defendants, when the plaintiff moved the court for a new trial, for the following reasons:

1st. That there was error in admitting evidence of the declarations of *William Chess,* the grantor, after the execution of the deed in question.

2d. In admitting the evidence of *Samuel Thompson, Benjamin Darlington, T. B. Dallas, George Evans,* and others, in relation to the credibility of *John Ross,* whose general character had been impeached by the plaintiff, and of whose general character these witnesses had no knowledge.

3d. In the court charging the jury, that if the deed of the 14th February, 1823, was invalid at that time, it could not be made valid by any subsequent act.

4th. In the court taking from the jury the consideration of the question, whether the deed of the 14th February, 1823, was confirmed or made good by any subsequent act of confirmation, or by a new delivery at any time afterwards.

5th. In charging the jury, that recording the deed was no delivery, but only evidence of it, of which the jury were to judge.

6th. In sustaining the challenge, by defendant's counsel, of *William Kerr,* a juror, on the sole ground that he was a witness in the case.

Which were overruled by the judge, and judgment was entered on the verdict, from which the plaintiff appealed.

In this court the cause was argued by *Burke* and *Baldwin* for appellant.

1st. The declarations of a grantor, after the execution of a deed, cannot be given in evidence to invalidate that deed. And if there be any reason for admitting evidence of the declarations of a testator in relation to a will made by him, that reason does not apply to the case of a deed: for wills are always revocable by the persons who make them, but deeds are not. A will is only consummated by the death of the testator, but a deed is consummated by delivery.

2d. A witness must first state, that he is acquainted with the general reputation for truth, of the person whose veracity is questioned, before he can be asked, or permitted to answer, the question, whether he would believe him on his oath. The law is well laid down on this subject in *Kimmel* v. *Kimmel,* 3 *Serg. &*

(John Chess *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess, Nelly Chess and Mary Chess.)

*Rawle,* 336. *Wike* v. *Lightner,* 11 *Serg. & Rawle,* 198–9. *Brindle et als.* v. *M'Ivaine,* 10 *Serg. & Rawle,* 485. *Norris's Peake,* 197. *Swift's Ev.* 148. 1 *Stark. Ev.* 148. 1 *M'Nally,* 304. *Bull Nisi Pri.* 296. *Phil. Ev.* 229. 3 *Danes Dig.* 346. 2 *Gilb. Ev.* 296.

3d and 4th. If *William Chess* had been incompetent to make a deed on the 14th of February, 1823, in consequence of weakness of intellect, and the deed was therefore invalid, yet by subsequent declarations and acts he might confirm it and make it valid; this he did do by exhibiting and reading it, and declaring to several persons that he had conveyed the land in dispute to his son. It was therefore manifest error in the court to decide that the deed could not be made valid by confirmation, and withdrawing the consideration of this part of the case from the jury. Cited *Shales* v. *Sir John Barrengton.* 2 *Pr. Wills,* 270. *Murry* v. *Riggs et als.* 15 *Johns. Rep.* 573–586. *Verplank* v. *Sterry,* 2 *Eq. Ca. Ab.* 183. *Verplank* v. *Sterry,* 12 *Johns. Rep.* 552. *Bennet* v. *Vade et als.* 2 *Atk. Rep.* 324. *Shaler* v. *Barrengton,* 1 *Pr. Wms.* 482. *Simms* v. *Slacum,* 3 *Cranch. Rep.* 300. *Fletcher* v. *Peck,* 6 *Cranch. Rep.* 133. *Jackson ex dem.* v. *Eaton,* 20 *Johns. Rep.* 482. *Broomin* v. *Phelps,* 2 *Johns. Rep.* 178. The *Juniata Bank* v. *Brown,* 5 *Serg. & Rawle,* 231–234. *Duncan* v. *M'Cullough,* 4 *Serg. & Rawle,* 485. *Wiseman v. Beake,* 2 *Vernon,* 121. *Baugh* v. *Price,* 1 *Wilson,* 320. *Smith* v. *French,* 2 *Atkins* 244. *Powel on Con.* 163–193. *Newlin on Con.* 497–500. *Coke Litt.* 295–6. *Parker* v. *Parmele,* 20 *Johns.* 134. *Yard* v. *Adlum,* 1 *Rawle Rep.* 171–177.

5th. The deed remained in the hands of the grantor after its execution, and on the 16th April, 1823, it was put upon record by him, which was, of itself, a delivery and confirmation; for it is not necessary to the validity of a delivery, that it should be made to the grantee; it may be made to a third person, and not in the presence of the grantee. *Verplank* v. *Sterry,* 12 *Johns, Rep.* 547–551. *Jackson ex dem* v. *Phipps,* 12 *Johns. Rep.* 421. 13 *Viner's Ab.* 21. *Souverbye* v. *Arden,* 1 *Johns. Chan.* 255. *Taylor et al* v. *Glaser,* 2 *Serg. & Rawle.* 502. The recording of a deed by the grantor, under our recording act, is equivalent to a livery of seisin. *Purd. Dig.* 165. A delivery is essential to, and is the consummation of a specialty. *Taylor et al* v. *Glaser,* 2 *Serg. & Rawle,* 503–4. *Goodright* v. *Shaphen. Cowper's Rep.* 203. *Shepherd's Tou.* 60. *Perkins,* 154. *Inhabitants of Worcester* v. *Eaton,* 13 *Mass. Rep.* 374–5. *Jenkin's Rep.* 166. *Coke Litt. b.* 48. *Butler and Baker's case,* 3 *Coke's Rep.* 36. *Jennings* v. *Bragg, Croke Eliz.* 447.

6th. It is not a good cause of challenge, that the juror called, had given evidence on a former trial, or that he had been subpœnaed to give evidence on the trial to which he was called as a juror. Every juror in the box probably knew *John Ross,* and all might have been excluded on the same ground. On this point were

(John Chess, *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess
Nelly Chess and Mary Chess.)

cited, *Harper et al* v. *Kean*, 11 *Serg. & Rawle*, 380. *Parker* v. *Thornton*, 2 *Lord Ray.* 1410. 21 *Vin. Ab.* 268–272. *Durell* v. *Mosher*, 8 *Johns. Rep.* 347.

*Wilkins* and *Forward* for appellees.

1st. The declarations of *William Chess*, made after the execution of the deed, were competent evidence for the purpose for which they were given. We had shewn satisfactorily, as we believed, that he was incapable of making a deed on the 14th February, 1823; the plaintiff contended and endeavoured to shew, that even if the deed was invalid at the time it was executed, it became valid by the subsequent declarations and acts of confirmation by the grantor. It therefore became important for us to shew, by his conduct and declarations, after its execution, that he remained incapable of making a deed; and there is no better criterion by which to judge of a man's intellect, than his conduct and declarations. The rule of law is well settled, that it is competent to give in evidence the declarations of a testator, both before and after the execution of his will, in order to shew imbecility of mind, or incompetency to make a will; and there is no difference in the cases of a will and deed, when the testimony is offered for the same purpose.

2. All the witnesses examined as to the general character of *John Ross*, had previously known him for many years; they lived but four miles from him, and were perfectly competent to testify from their knowledge, whether they would believe him on his oath. *Kimmel* v. *Kimmel*. 3 *Serg. & Rawle*, 336. *Wike* v. *Lightner*, 11 *Serg. & Rawle*, 198–9. *Brindle et all* v. *M'Ilvaine*, 10 *Serg. & Rawle*, 285.

3d. and 4th. That which is absolutely void can never be made valid. If the facts were merely, that *William Chess* was incapable of making a deed on the 14th February, 1823, in consequence of imbecility of mind, a deed executed by him at that time, although ineffectual for any purpose, yet it might afterwards be confirmed. But that was not this case. Here it was alleged, and proved, that *John Chess* had obtained the deed from his imbecile father by fraud and imposition; it was, therefore, absolutely void, and no confirmation can rest upon the basis of fraud; there must be a new consideration. *Murry* v. *Riggs*, 15 *Johns. Rep.* 573. *Duncan* v. *Findley*, 4 *Serg. & Rawle*, 483.

5th. The plaintiff's title cannot rest upon the fact, that the recording of the deed was a good and effectual delivery of it, for it is disproved by the fact, that previously to that period, *John Chess* had brought an ejectment to recover the land now in dispute, by virtue of this deed. But there was no evidence that *William Chess* put the deed upon record. It was a matter of fact to be left to the jury to be judged of.

(John Chess, *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess, Nelly Chess and Mary Chess.)

6th. Jurors ought to be perfectly impartial between the parties. In the case of *Harper & Irvine* v. *Kean,* 11 *Serg. & Rawle,* 280, it is said, that if the testimony which the juror has given, is such as to shew, that he has formed an opinion on one side or the other, he ought to be rejected: here the juror was to testify as to a fact of great importance, and one which had created a great deal of excitement in the cause, on the one side and the other. But even if the judge who tried the cause was wrong in rejecting the juror, yet it is not a good reason for a new trial.

This is the second verdict which has been rendered for the defendants, and unless manifest injustice is done, the court will not grant a new trial. *Willis's Lessee* v. *Bucher,* 2 *Bin. Rep.* 467. *Kible's Lessee* v. *Arthurs,* 3 *Bin. Rep.* 26. *Campbell* v. *Spenser,* 2 *Bin. Rep.* 133. *Hiester* v. *Lynch,* 1 *Yeates' Rep.* 108.

The opinion of the court was delivered by

SMITH J.—The long and warmly litigated cause of *Chess* v. *Chess* and others, was tried at the last circuit court, at Pittsburg, before Mr. Justice *Rodgers,* and again comes before this court for decision, on an appeal from the judgment of that court. It is a family contest, and has not only been before the court of common pleas, and the supreme court of Allegheny county, but also heretofore before the circuit court; and like most family disputes, has engendered more ill blood than is usual in other controversies: indeed, in the present instance, this has not been merely confined to the parties immediately interested, but extended, as we regret to observe, to some of the witnesses. The late trial, as well as a former one, was long and arduous, and after a most patient investigation, and an examination of many witnesses, which occupied the attention of Justice *Rogers* ten days, the cause was submitted, under his charge, to the decision of the jury. The action is an ejectment, brought by *John Chess* against *William Chess and others,* to recover the possession of about one hundred and twenty-one acres of land, a part of a larger tract, late the estate of *William Chess,* deceased, father of the parties to this suit. The plaintiff alleges, that the tract of land which he claims, was conveyed to him by *William Chess,* his father, on the 14th February, 1823, by deed. The consideration in this deed mentioned, is " natural love and affection, and one hundred dollars." The defendants allege it was not so conveyed, and claim the land as heirs at law of the said *William Chess,* deceased; so that both parties claim under the same person.

At the trial, the defendants contended, that *William Chess* was generally and partially deranged; that he was of weak mind, and a fit subject of imposition and fraud; and that such was the case when he executed the deed to *John Chess.* The plaintiff denied this,

(John Chess *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess, Nelly Chess and Mary Chess.)

and contended that his father was sane at the time; and further, that even if he had been insane on the 14th February, 1823, yet, that he afterwards, at a time when he was in his perfect senses, ratified and confirmed the deed, and that therefore he is entitled to recover the land. The jury found a verdict for the defendants, and the court refused to set it aside, and grant a new trial, but rendered a judgment on the verdict, from which the plaintiff has appealed to this court, for the following reasons:—That there was error, 1st. In admitting evidence of the declarations of *William Chess*, the grantor, after the execution of the deed in question, as testified by *John Ross, William Kearns* and others. 2d. In admitting the evidence of *Samuel Thompson, Benjamin Darlington, T. B. Dallas, George Evans,* and others, in relation to the credibility of *John Ross,* whose general character had been impeached by the plaintiff, and of whose general character these witnesses had no knowledge. 3d. In the court charging the jury, that if the deed of the 14th February, 1823 was invalid at that time, it could not be made valid by any subsequent act. 4th. In the court taking from the jury the consideration of the question, whether the deed of the 14th February was confirmed by any subsequent act of confirmation, or by a new delivery at any time afterwards. 5th. In charging the jury that recording the deed was no delivery, but only evidence of it, of which jury were to judge. 6th. In sustaining the challenge, by defendant's counsel, of *William Kerr,* a juror, on the sole ground that he was a witness in the cause. The exceptions or reasons for a new trial, have been very zealously and ingeniously argued by the counsel, and many authorities have been cited.

In regard to the first reason, it may be observed, that the principle is well settled, that no one shall be permitted to invalidate his own deed by his subsequent expressions: hence it is contended by the plaintiff, that the court before which the cause was tried, erred in admitting the declarations of *William Chess,* made after the execution of the deed to *John Chess.* In reference to this part of the case, we ought constantly to keep in mind, what the real question before the court was, and under what circumstances the conversations of the grantor relative to other subjects, as well as to the deed, his declarations and acts, were admitted in evidence, and submitted to the jury. The insanity of the grantor was alleged on one side, and denied on the other; and the jury were called to say, whether *William Chess* was sane, or insane, on the 14th February, 1823. If, under such circumstances, I was required to decide upon the sanity or insanity of a person, I know not how I could do so, unless I was permitted to judge from his conversations, declarations and acts; these would be the only means to enable me to form a judgment. Here the defendants offered, and the court received, evidence of the conversations, the declarations and the acts of *William Chess,*

(John Chess *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess, Nelly Chess and Mary Chess.)

not, as is supposed, for the purpose of verifying the facts stated in those conversations, but to shew the state of his mind—not to effect his deed—not as declarations made contrary to it, after its execution; but to shew imbecility of judgment, weakness of intellect and insanity; in short to show the true character of his understanding, on and about the 14th of February, 1823. This, and this alone, was the object of the evidence offered. The court did not decide that the declarations of the grantor, after deed made, could be received to destroy it; but expressly said, that these declarations were admissable, not as revoking his acts done, but as the means of ascertaining whether *William Chess* was sane or insane, weak or competent. On this point the parties were at issue; the defendants alleged insanity—it therefore became incumbent on them to prove it, since every one is presumed to be of perfect mind and memory, unless the contrary be proved. In this case the defendants pursued the proper course, and proceeded to prove *William Chess's* insanity, by the very index of his mind, his conversations, declarations and acts, for which purpose they examined many witnesses. The plaintiff did the same, to prove his sanity, and thus there was brought before the court a mass of contradictory evidence, all of which was fairly and legally submitted to the consideration of the jury. The judge on the trial, discovered no inclination either way; but on all the evidence, left the sanity of the testator as a mere fact to the jury, who were the judges of it. I fully agree with the counsel for the defendants, that the case of *Smith* v. *Irish,* so often mentioned, has placed this matter upon the true ground, and decides it. If, indeed, the evidence had been received for purposes similar to those mentioned in the numerous cases cited on the part of the plaintiff, manifest error would have intervened; the object, however, having been entirely different, the cases do not apply. We think there was no error in admitting this evidence.

In the next place it is said that the court erred in admitting the evidence of *Samuel Thompson, T. B. Dallas* and others, in relation to the credibility of *John Ross,* one of the defendant's witnesses, whose general character had been impeached by the plaintiff, and of whose general character the witnesses had no knowledge. The plaintiff, after *John Ross* had been examined in chief on the part of the defendants, called a number of witnesses *to his general character in his neighbourhood,* as to truth, who said it was bad. The defendants then to rebut this, and *support* his character, called witnesses who testified, in substance, that they had known him many years, some of them all his lifetime, but that they could only speak of his general character as to veracity, without being able to say what it was in his immediate neighbourhood; and some of these witnesses were then asked, *whether they would believe him on his oath, from what they knew of his general character?* And of this

(John Chess *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess, Nelly Chess and Mary Chess.)

the plaintiff complains. He contends, that as the witnesses only knew his general character, but could say nothing of his character, *in his immediate neighbourhood*, they ought not to have been admitted to testify. I have not been able to discover any error in the admission of this evidence: indeed I thought the point here raised, had been at rest since the decision of *Kimmel* v. *Kimmel*, 3 *Serg. & Rawle*, 336. In that case the question was asked, "What is the general reputation of Peter Kimmel, *in the county*, as a man of truth?" which was excepted to, and the court below sustained the objection, and overruled the testimony. The supreme court, on a writ of error, reversed the judgment; and Justice *Duncan* in that case said, "character and reputation are the same: the reputation which a man has in society is his character, and where it is in issue, particular facts cannot be inquired into, nor given in evidence, nor can mere opinion." In the case cited from 11 *Serg. & Rawle*, 199, this case of *Kimmel* v. *Kimmel* is recognized. The question there was, whether he knew the general character of the witness? This, said the court, was strictly proper, and add, what is said *by people in general*, is the true point of inquiry; and every thing short of it is incorrect; so that we find, the witness is not strictly confined to the immediate neighbourhood of the person, but is allowed to say, what his character for truth is in *the county*, or what *the people in general* say as to his general character. In this last mentioned case it. is declared, that to the question, whether the witness would believe him on his oath? a direct answer would not be objectionable, provided the belief was founded on the witnesses's knowledge of his general character, otherwise, it would not be to the purpose; though I will observe, that in practice, I have heard the single question, "would you believe him on oath?" put for thirty years and more without objection. To come then to the case immediately before us: Justice *Rogers* decided that *in attacking* the character of a witness, the proper mode was to ask the witness whether he was acquainted with the general character of the witness for truth and veracity, and whether from that general character, he would believe him on his oath? He further decided, that *in supporting* the character of the witness, the same mode should be pursued. The witness whose character was impeached, lived in St. Clair township, about four miles from Pittsburg, and is a man well known in Allegheny county. The witnesses who supported his character, live in Pittsburg; they had seen him often, transacted business with him, knew him well, and were acquainted with his character. With regard to the meaning of the terms, *neighbours, neighbourhood, immediate neighbourhood*, I would say, in reference to the present objection, that they were co-extensive with the range of *John Ross'* frequent intercourse with his fellow citizens, which, from the evidence, includes the county of Alle-

(John Chess *v*. Finly Chess, William Chess, Wesly Chess, Andrew Chess,
Nelly Chess and Mary Chess.)

gheny.   On this part of the case I am authorized to state, that at
the trial of the case, Judge *Rogers* was of opinion, although he did
not so decide, that greater latitude is given *in support*, than in
attacking character; and this I think is abundantly supported by
the authorities, and by the reason of the thing. So that if there was
error, it was in favour of the plaintiff who excepts.   But, in our
opinion, there was no error; and a new trial cannot be awarded.

   I proceed to the examination of the 3d and 4th exceptions,
which may be considered together.   In regard to the third, I must,
however, observe, that the counsel have changed the words and
meaning of the judge, to make the error of which they complain.
The exception is, that the jury was told, if the deed of 14th Feb-
ruary, 1823, was invalid at that time, it would not be made valid
by any subsequent act.   The court did not say so—the words of the
Judge are, " If *William Chess* was insane at the time of the execu-
tion and delivery of the deed, or if it was procured by imposition
and fraud, the deed was absolutely *void*, and no acts or declarations
of his, which have been given in evidence, would confirm it."   The
meaning of the judge is evident, and cannot be misunderstood; he
did not inform the jury that an *invalid* deed could not be made
*valid*.   The cases cited on this subject clearly establish the distinc-
tion between a *void* and an *invalid* or *voidable* deed, and that the
former cannot be confirmed, though the latter may.   In *Coke Litt.*
295, *b*. a confirmation is said to be a conveyance, whereby a *voidable*
estate is made good, or a lesser estate is enlarged; but when a deed
is *void*, then there can be no confirmation.   In 1 *Wils.* 320, it is
decided, that articles and conveyances obtained by fraud and impo-
sition, were not made good by the subsequent acts and declarations
of the grantor.   So also in 15 *Johns.* 573, and *Duncan* v. *Findley*, 4
*Serg. & Rawle*, 483, and many more cases might be cited, establish-
ing the same doctrine.   I think Lord Mansfield somewhere has said,
there could be no confirmation of a thing absolutely void; but that
the acts of the grantor might operate as a new grant.   Were there
any such acts proved in this case?   I have looked for these in the
evidence, but looked in vain: they are not to be found in the evi-
dence: (I speak here my own sentiments) on the contrary a host
of witnesses proved Mr. *Chess*, the father, to be a man of weak
and confined intellect, at intervals clearly insane, and at all times
incapable of transacting business, unless with the advice of his
family.   He did not for many years before his death, manage or
direct the business of his farm, but left it to others.   For years, as
the plaintiff's own witnesses proved, he entertained a groundless
antipathy against his wife and his eldest daughter; and some time
previous to the 14th February, 1823, he went to reside with the
plaintiff, who had before been advanced more than a child's share,
and whose influence over him I can hardly doubt.   In short, the

(John Chess *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess, Nelly Chess and Mary Chess.)

circumstances, before and at the execution of the deed, were very suspicious, and after the execution the grantor returned with John, continued with him, and subject to his influence, until near his death; during all which time, there is not any act or expression, not a whisper proved, indicating a confirmation of his deed. To me it does appear, that the condition of his intellect was . no better *after,* than before or at the date of the deed; if, indeed, there was any change, it was for the worse. When he spoke of the contents of the deed, he spoke of it as containing one hundred acres and no more, although the deed contains one hundred and twenty-one acres; and we are told that the surplus of twenty-one acres is full of coal, and therefore very valuable. When and where then, I ask, did he confirm the deed? But I repeat it, if there was *actual fraud* when the deed was executed, it could not be confirmed; for it then comes directly within the principle settled in *Duncan* v. *Findley,* 4 *Serg.* & *Rawle,* 483, and since in *Yard* v. *Adlum,* 1 *Rawle,* 171. I cannot discover that the court took any facts, which were offered to prove a confirmation of the deed, from the consideration, of the jury, to say whether the grantor was sane and of perfect mind, and free from imposition or fraud, at the time the alleged confirmation was made or not. These exceptions are not sustained.

The 5th reason is, that the court erred in charging the jury, that recording the deed was no delivery, but only evidence of it, of which the jury were to judge. In the argument on this point, the counsel, with much apparent plausibility, contended, that by our recording act of 1715, deeds of bargain and sale have the same effect as a feoffment, that enrolling is like livery of seisen, and that a deed takes effect from it. Without entering into a minute examination of the soundness of the doctrine contended for, as that appears to me not necessary, I will venture my opinion. thus far, that although a feoffment, lease and release, fine, &c. are said to operate by transmutation of possession, and a bargain and sale by the act alluded to, has the same legal effect as as a feoffment or release, yet *the time* when the deed of bargain and sale takes effect, is the time of actual delivery. In the evidence, I can see no proof of the delivery of the deed, or any thing to show who placed it on record; indeed, it appears to me, there is not the colour of evidence that *William Chess* took the deed to the recording office; all that is proved as to this part of the cause, being, that two or three weeks before the 1st of April, the old man came to the river, and said, "he was going to get the deed recorded;" and thus far he is traced, and no further. It was not *then* recorded, and not until about three weeks after, by whom, no one does or can say. I have examined the testimony bearing on this part of the cause, with some attention, and it appears to me, that if the deed was not delivered on the 14th February, 1823, there is no evidence, that

it was delivered in fact at any other time. The mere reading of it is not a delivery, it is evidence only of a delivery. Delivery is requisite to the proper and legal execution of a deed, and it may be, as stated in *Shepp. Touch.* 57–58, and 12 *Johns.* 421, either actual, by doing something, and saying nothing, or else verbal, by saying something and doing nothing; or it may be by both; but by one or both of them, it must be made: for otherwise, though it be ever so well sealed and written, yet it is of no force. The delivery may be to the party, or to any one for the party, if duly authorized; or to a stranger, for the use of the party, without authority. I cannot see, in this case, any evidence of a delivery by *William Chess*. If then the deed was not delivered on the 14th February, 1823; if on that day the grantor was insane; it was incumbent on the plaintiff to show when it was delivered. He has not done so; and in the absence of proof to the contrary, the inevitable presumption is, it was delivered in fact on the day it bears date: but on that day the jury have pronounced him to have been insane, and it is therefore almost unnecessary to say, this deed could not have been legally executed. The recording of it, therefore, was no delivery; at best, it was merely evidence of delivery, of which the jury were to judge. I am accordingly of opinion, that in respect to this part of the cause, the judge charged correctly, and that, for the reason here assigned, we ought not to grant a new trial.

One exception more remains to be adverted to. It is, that the court erred in sustaining the challenge of the defendants, to a juror, on the sole ground that he was a witness in the cause. In the case of *Harper & Irvine* v. *Kean*, 11 *Serg. & Rawle*, 280, the cause of challenge was "that the juror had been examined before arbitrators, as a witness for the defendant;" and it is there said, that a juror is a competent witness, and that therefore it cannot be a rule, that one cannot be a juror, because he has given testimony in the same cause before another tribunal: but it is also there said, that it seems if the testimony be of such a nature, as to show that he had formed an opinion in favour of one of the parties, it ought to exclude him from the jury. And this is right. In this case the juror wished to be excused, and stated he was a witness. It did not then appear what he would prove; but it was known he was a witness for the plaintiff: and if, as it has been said, he was to be called to impeach the character of *John Ross*, who was an important witness for the defendants, and whom it was said the juror would not believe on oath, he ought to have been excluded from the jury. In delivering the opinion of this court, in a case at the last term for the middle district at Sunbury, I said, that it did not escape the discernment of our legislature, that a principle requisite to secure a due administration of justice, and fair and impartial trials, was to have jurors who were impartial and entirely free from all kind of bias,

(John Chess *v.* Finly Chess, William Chess, Wesly Chess, Andrew Chess,
        Nelly Chess and Mary Chess.)

or the suspicion thereof; that·like Cæsar's wife, they ought not only.
to be pure, but unsuspected. Our jury law manifestly provides for
an impartial jury. What was done in this particular, in the case
before us? Why a doubtful man was set aside, in a great measure
upon his own request, and one not liable to any objection, substi-
tuted. · Surely this, was not error. In fine, we are of opinion, that a
new trial ought not to be granted, for any of the reasons assigned,
but that the judgment of the circuit court should be affirmed.

Top, Justice, dissented.